SUE FAHAMI
Acting United States Attorney
District of Nevada
Nevada Bar No. 5634
AFROZA YEASMIN
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
Afroza.Yeasmin@usdoj.gov
*Attorneys for the United States*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:24-cr-00141-CDS-BNW |
| Plaintiff, | |
| v. | **Government's Response to Defendant's Sentencing Memorandum [ECF 32]** |
| TODD ANDREW MAXSON, | |
| Defendant. | |

## I.      INTRODUCTION

Defendant Todd Andrew Maxson, on October 2, 2024, pleaded guilty to a three-count indictment related to the sexual exploitation of a minor that he sought out on the internet specifically to produce and receive child sexual abuse material (CSAM) for a fee. ECF No. 31 at 4 ¶¶ 1-2.  The government requests the Court impose the parties' joint recommendation of 180 months in custody, to be followed by a lifetime term of supervised release. ECF No. 22 at 14 ¶ 21. A 180-month sentence is sufficient, but not greater than necessary, to further the goals of sentencing. Additionally, the government requests that the lifetime term of supervised release be imposed with all mandatory, standard, and special conditions recommended by Probation in the revised Presentence Investigation Report (PSR), dated January 30, 2025. ECF No. 31 at 27-30.

## II.    STATEMENT OF FACTS AND RELEVANT PROCEDURAL HISTORY[1]

On October 25, 2023, the mother of Victim #1, a then 14-year-old female minor, reported to a school located in Clark County that she had observed concerning content on the child's phone. After a conversation with the school, and vice detectives of the Las Vegas Metropolitan Police Department (LVMPD), agents from the Federal Bureau of Investigations' (FBI) Crimes Against Children Taskforce were brought in to investigate. Their investigation revealed that defendant Todd Andrew Maxson, who was 55 years old at the time, began a conversation with Victim #1, on September 25, 2023, via Telegram, an internet based social media application that allows users to privately message other users. The defendant wrote to her "hello angel" and requested to see a "preview." He also asked the minor to tell him a little bit about herself. Within the first three minutes of the conversation, Victim #1 informed the defendant that she was only 14 years old and that "he did not need to buy from her." Despite receiving this information, the conversation continued, and within the next few minutes, the defendant ordered a sexually explicit video of Victim #1 where he directed her to insert her fingers into her vagina. He then paid the minor for the child sexual abuse material via CashApp, an internet-based application that allows for the exchange of money between users. He paid for the abuse content after Victim #1 informed him that she finished making the video. He sent a screenshot of his CashApp payment through the Telegram chat and then received the specific video that he had ordered. The abuse material was made specifically to complete the defendant's demand. He then told the victim how attractive he found her and requested another sexual video but this time ordering that her face be displayed in it and that the video contain sound.

---

[1]    The factual basis is contained in ECF No. 22 at 9-10 ¶¶ 13-15. It is supplemented by the revised PSR. ECF No. 31 at 4-9 ¶¶ 4-28.

Between September 25, 2023, and October 19, 2023, the defendant contacted the minor daily and spoke with her regularly throughout the day. Almost every single day for a month, the defendant received some form of CSAM from the minor for a fee. The scheme was always the same, he would contact her, order CSAM, pay for it through CashApp, and then receive the abuse material after providing a screenshot of the payment.

On several occasions his orders had very specific instructions. He directed Victim #1 to film herself engaged in specific sexual conduct for a particular length of time, in specific locations, using specific items. He also attempted to instruct her as to what to do with the content after he received it. For example, he ordered a video of Victim #1 in the shower, touching herself, and spreading her vagina. He wanted a four-minute video of this sexual conduct. This was just one of several requests, and the defendant received each of the videos he requested with the specific requirements he demanded.

A review of the defendant's phone by FBI revealed that Victim #1 was not the only minor that the defendant specifically sought out to produce and receive child sexual abuse material from. The scheme described above was employed against several other minors and young adult females. A review of the chats he engaged in, reveals that almost immediately he would express an interest in the visual depiction of blood and the menstrual cycle of minors.

In this case, the defendant asked Victim #1 if she had started her period yet and then repeatedly requested a sexually explicit video of the minor on her period when it arrived.

The defendant's chats also revealed that he specifically sought out females expressing suicidal or depressive tendencies and encouraged the behavior by requesting sexual content involving cutting and bleeding. He satisfied this need by requesting explicit videos of victims engaged in sexual acts while on their periods or self-harming. The defendant facilitated

suicidal and self-harm behavior for his own sexual gratification by creating Amazon "wish lists" for the suicidal victims to mail them knives and other objects to use in the videos he ordered from them.

On June 18, 2024, an indictment (ECF No. 1) was filed in the District of Nevada charging the defendant with three counts: Sexual Exploitation of Children in violation of 18 U.S.C. § 2251(a), Receipt of Child Pornography in violation of 18 U.S.C. § 2252A(a)(2), and Possession of Child Pornography in violation of 18 U.S.C. § 2252A(a)(5)(B).

The defendant subsequently pleaded guilty to the three-count indictment on October 2, 2024. Sentencing is set for March 10, 2025.

### III.    APPLICATION OF SENTENCING GUIDELINES

The sentencing guideline calculations included in the revised PSR (ECF No. 31) are correct and the government asks this Court to adopt them.

As explained in the revised PSR, counts 2 and 3 of the indictment (ECF no. 1) are grouped as "Count Group One." ECF No. 31 at 10 ¶ 32. Count 1 and "Count Group One" are further grouped for the purposes of sentencing guideline calculations as associated conduct for each count "constitutes a common scheme or plan." *Id* at ¶33. As such, the defendant's total offense level is correctly calculated to be 38.[2]

Accordingly, given the defendant's acceptance of responsibility in a timely manner, defendant's total adjusted offense level is 35. The defendant's criminal history category is I resulting in a guideline range of 168 – 210 months. The mandatory minimum term of

---

[2] The Plea Agreement in error enumerates an additional +2 enhancement for a "sexual act" for Count 1 pursuant to USSG § 2G2.1(b)(2)(A)], however, upon review, the conduct associated with the instant matter does not fall within the definition of "sexual act" or "sexual contact" as defined in 18 U.S. Code § 2246(2) or (3) (respectively). ECF No. 22 at 12.

incarceration for Count 1 of the indictment is 15 years of incarceration, so the defendant's sentencing guidelines are effectively 180-210 months. Per the plea agreement, consistent with Probation's recommendation, the parties jointly recommend that the Court sentence the defendant to 180 months in custody.

### IV.    ARGUMENT

**A. Term of Imprisonment**

The goal of sentencing is to "'impose a sentence sufficient but not greater than necessary' to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed . . . correctional treatment." *United States v. Carry*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)). The Court considers "the nature and circumstances of the offense and the history and characteristics of the defendant," "the need for the sentence imposed," "the kinds of sentences available," the applicable sentencing guideline range, any pertinent policy statement, sentences imposed on other similarly situated defendants, and the need for victim restitution. *See* 18 U.S.C. § 3553(a). Considering the relevant factors, the Court should impose a 180-month sentence with a lifetime term of supervised release.

The defendant sought out children on the internet specifically to produce and receive child sexual abuse material from them for a fee. The abuse content received by the defendant was often specifically created at the demand of the defendant with specifications requiring the depiction of genitalia, sex toys, blood, bleeding, or cutting.[3] Particularly alarming, is the defendant's proclivity for children with depression or suicidal ideation. The

---

[3] Cutting is a form of self-harm where a person intentionally inflicts physical harm upon themselves, often through cutting their skin but may employ other methods, to inflict pain.

contact with these minors did not end with just conversations about these topics but went further to include the sending of knives to complete his request for the depiction of self-harm and blood in the child sexual abuse content he ordered.

For these reasons, a 180-month sentence of incarceration is sufficient, but not greater than necessary, to reflect the seriousness of the offense, provide just punishment, afford adequate deterrence, and protect the public.

**B. Supervised Release**

As agreed by the parties, the government requests the imposition of a lifetime term of supervised release. ECF No. 22 at 14 ¶ 21.

The PROTECT Act of 2003, codified in relevant part in 18 U.S.C. § 3583(k), imposes a mandatory minimum term of 5 years of supervised release, and a maximum term of life, for offenses related to the trafficking of child pornography. The 2012 Sentencing Commission Report to Congress (hereinafter "2012 Report") discussed the necessity, appropriateness, and the widely-applied imposition of lifetime supervision in child pornography matters as "effective supervision and treatment of offenders (as a condition of supervision) are important means of reducing recidivism and promoting public safety"[4] The 2012 Report referenced a study conducted by the Sentencing Commission that tracked the recidivism of qualifying child pornography offenders with non-production convictions. The 2021 Sentencing Commission Report to Congress (hereinafter "2021 Report") expanded on the 2012 Report providing more updated statistics related to the recidivism rates of qualifying child pornography offenders who

---

[4] U.S. Sent'g Comm'n, *Report to Congress: Federal Child Pornography Offenses*, ch. 10-11 (Dec. 2012)

were released from incarceration or placed on supervision in 2015.[5] Further highlighting the high recidivism rates that continue to persist is the fact that, in the 2023 fiscal year, 12.7% of offenders convicted for trafficking child pornography, 25.6% of offenders convicted for possessing child pornography, and 12.5% of offenders convicted for receiving child pornography had a prior sexual abuse or child pornography conviction.[6]

To address recidivism, Probation imposes two categories of conditions on offenders of child pornography. The first addresses rehabilitation by requiring treatment and restricting behaviors that are associated with sexual deviance, while the second addresses deterrence through early detection of violations or indicia of the potential in a relapse of behavior. The aforementioned Reports not only highlight the rates of recidivism in child pornography offenders but also discuss the positive[7] impact that longer terms of supervision have on preventing new abuse or relapsing into old patterns.

In the instant matter, there is a heightened necessity to both prevent recidivism and detect as early as possible the indicia of relapse. The defendant victimized numerous minors over the internet by purchasing CSAM often produced at his direction. He specifically sought out minors on the internet for this purpose. Further, he specifically sought out or ordered content related to self-harm and bleeding. The defendant has clearly demonstrated the lengths he is willing to go to satisfy his deviant needs despite knowing

---

[5] U.S. Sent'g Comm'n, *Report to Congress: Federal Child Pornography Offenses* (June 2021)
[6] SOURCE: United States Sentencing Commission, FY 2019 through FY 2023 Datafiles, USSCFY19-USSCFY23. https://www.ussc.gov/research/datafiles/commission-datafiles
[7] The 2012 Report states that "longer terms of supervision may deter some offenders from committing new offenses but also present other offenders with an increased opportunity to violate the conditions of supervision (footnote 43)." Early detection of relapsing behavior through violations of the conditions of supervised release further demonstrates the necessity of continued or longer terms of supervision.

the age of the victims and the grave consequences of encouraging self-harm in a person exhibiting suicidal thoughts.

The defendant's likelihood to re-offend and any further harm to the children will be reduced if he remains on supervision for the longest period of time possible, which in this case is the agreed upon term of life. A lengthy term of supervision will go far in keeping the community safe from the defendant by providing offender management services and keeping him accountable. Aside from sex offender rehabilitation, which is undoubtedly warranted in this case considering the defendant admitted deviant sexual behavior, he would also benefit from the recommended mandatory, standard, and special conditions enumerated in the PSR.

Conditions of supervised release may only be imposed if they are reasonably related to the goals of deterrence, protection of the public, or rehabilitation of the offender. 18 U.S.C. §§ 3583(d)(1), 3553(a). However, conditions of supervised release need not relate to the defendant's underlying offense, so long as they relate to at least one of these goals. *United States v. Wise*, 391 F.3d 1027, 1031 (9th Cir. 2004). The Ninth Circuit has consistently held that as long as the district court makes a factual finding which establishes a nexus between the condition and one of the goals articulated in 18 U.S.C. § 3553(a)(2)(B)-(D), the district court is not abusing its discretion to impose such a condition. *United States v. Terrigno*, 838 F.2d 371, 374 (9th Cir. 1988), *see also United States v. Hinkson*, 585 F.3d 1247, 1264 (9th Cir. 2009). Each of the conditions listed in the PSR are related to deterrence, protection of the public, or rehabilitation of the defendant. Accordingly, the government asks that all the mandatory, standard, and special conditions be imposed as recommended by the probation office.

//

**C. Government's Response to the defendant's Objections to the PSR**

    **i.     Response to objection to financial penalties.**

The defendant objects to the imposition of the special assessment mandated by the Justice for Victims of Trafficking Act of 2015 (JVTA) for defendants convicted of CSAM offenses that are determined to be non-indigent persons. The defendant also objects to the imposition of a special assessment requiring a statutorily determined monetary contribution to the Child Pornography Victims Reserve Fund created by the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 (AVAA).

    **i.  AVAA Assessment**

The government is not seeking the imposition of the AVAA special assessment. Both the JVTA special assessment and the AVAA special assessment fund are related to providing monetary resources to victims of CSAM trafficking. The AVAA special assessment, however, directly funds a reserve specifically created to provide victims of the offense the opportunity to receive restitution in the form of a "one-time payment in the amount of $35,000 (adjusted for inflation) from a Child Pornography Victims Reserve, subject to limitations." *See* AVAA 2018; also *see* 18 U.S. Code § 2259A. Effectively, it provides victims with an alternative to receiving restitution, that is not under the analysis enumerated in 18 U.S. Code § 2259(2), which requires a showing of losses incurred (or reasonably projected to occur) by harm caused by the trafficking of their CSAM as each new defendant is convicted of trafficking it. Victims may elect to receive the one-time payment to forego the agony of undergoing this process and notification each time a new offender has possessed, received, or distributed their CSAM.

The analysis to determine the monetary amount for the special assessment imposed by the AVAA relies on the defendant's ability to pay, while the mandatory restitution

9

analysis pursuant to 18 U.S. Code § 2259(2) does not take into account the defendant's ability to pay and relies solely on the victim's full loss amount. Nonetheless, since the crux of the AVAA special assessment and requirements for payout from the reserve it funds relies on the principles of restitution, the government is not requesting the imposition of the AVAA special assessment. The reasons for this decision are discussed in detail below in the restitution portion of this response, *see infra*. In short, however, necessary conversations with victims of the defendant's trafficking have not been able to be had due to the recency of both their identification and the creation of their CSAM. For these reasons, the government can neither effectively argue for the special assessment nor argue accurately as to the victim's wishes regarding which form of restitution they are interested in pursuing.

### ii.   **JVTA Assessment**

Pursuant to the Justice for Victims' Trafficking Act (JVTA), the Court shall impose a special assessment of $5,000, per count[8] if it determines that the defendant is a non-indigent person. *See* 18 U.S.C. § 3014; *see also*, ECF No. 22 at 7 ¶ 6e. The government requests that this Court impose the JVTA assessment as required because the defendant "has assets which give him the ability to pay" and is therefore a non-indigent person for the purposes of JVTA. ECF No. 32 at 22 ¶ 109; and *See United States v. Blakley*, No. 2:18-CR-45 JCM (DJA), 2022 WL 2160981 (D. Nev. June 15, 2022). The District Court in *Blakely* denied defendant's motion to reconsider the imposition of the JVTA assessment. They expressly rejected defendant's argument "that the court must find him indigent for purposes of the JVTA because he was unemployed and incarcerated at the time of

---

[8] *United States v. Randall*, 34 F.4th 867 (9th Cir. 2022) held that § 3014(a) requires a $5,000 fine per offense.

sentencing." *Id*. Instead, they found that probation's determination that the defendant was capable of paying restitution, coupled with the fact that the JVTA assessment "is not an additional fee due contemporaneously with Blakley's other financial responsibilities stemming from his conviction"[9] made the defendant a non-indigent person for the purposes of JVTA. The court went on further that, since the assessment does not need to be paid until after restitution is paid off in full, "should the defendant be able to satisfy his restitution obligations, he will have confirmed this court's finding that he is non-indigent." *Id*. The defendant's ability to pay restitution, and the subsequent employment necessary to do so, demonstrates his future earning capabilities. *See United States v. Shepherd*, 922 F.3d 753, 758-60 (6th Cir. 2019) (a defendant's future earning potential and employment prospects are probative of his ability to pay the JVTA assessment).

In the instant matter, Probation specifically notes that it does not believe the defendant is indigent as "the defendant has assets which can be used to satisfy monetary penalties in this case, thus he appears able to satisfy restitution and payment of assessments. Given the recommendation for imposition of these assessments and his mandatory restitution obligation, a fine was not recommended. Additionally, the plea agreement reflects the defendant will voluntarily release funds and property in which he has any interest to pay any fine or restitution ordered by the Court." ECF No. 32 at 31.

Importantly, the burden for establishing indigency under Section 3014(a) rests with the defendant.  And the district court is required to consider not only the defendant's current financial situation, but also the defendant's ability to pay in the future.  The Court

---

[9] *See* 18 U.S.C. § 3014(b) ("An assessment under [the JVTA] shall not be payable until the person subject to the assessment has satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim-compensation arising from the criminal convictions on which the special assessment is based.").

of Appeals in the Second Circuit in *Rosario* stated that "The Fourth, Fifth, Sixth, Eighth, Ninth, and Tenth Circuits—all of our sister circuits to have considered the issue—have held that courts may consider a defendant's future earning potential when determining indigency for purposes of imposing the JVTA assessment.[10] The Court in *Rosario,* citing *Shepherd*, stated that the district court's waiving of criminal fines did not change the indigency analysis for JVTA.[11] Additionally, *Shepherd* held that "appointment of counsel is not dispositive of indigency for purposes of imposing monetary penalties" as for the former the court considers 'a defendant's immediate ability to pay,' not future earning capabilities. *Id. See also United States v. Kelley*, 861 F.3d 790 (8th Cir. 2017).

In short, the Court should look to all available information to determine whether the defendant is indigent for the purposes of JVTA, even if he may have court-appointed counsel. The defendant is an able-bodied man, capable of employment post-incarceration, with no reliable reason or information to conclude otherwise. The defendant cannot meet his burden that he is indigent for the purposes of JVTA, and as such an assessment in the amount of $15,000 should be imposed. These funds are specifically earmarked for victims of trafficking, the exact type of victims in this case who are still at this time either unidentified or unable to exercise their rights to receive restitution for the harm and abuse committed against them. The defendant is not only capable of paying this assessment, but it will go a long way in beginning to address the harm suffered by many victims due to the

---

[10] *United States v. Rosario*, 7 F.4th 65 (2d Cir. 2021) citing *United States v. McMiller*, 954 F.3d 670, 675 (4th Cir. 2020); *Shepherd*, 922 F.3d at 758–59; *Graves*, 908 F.3d at 141; *United States v. Kelley*, 861 F.3d 790, 802 (8th Cir. 2017); *see also United States v. Janatsch*, 722 F. App'x 806, 810–11 (10th Cir. 2018); *United States v. Strange*, 692 F. App'x 346, 348–49 (9th Cir. 2017).
[11] *Id.*

actions of the defendant. For the above reasons, the government requests that the Court impose this condition as part of the defendant's term of supervised release.

### ii.    Response to objection to special condition No. 2: no alcohol.

It is well-documented that the defendant is struggling with his mental health and alcoholism. The revised PSR outlines in detail his prior DUI convictions, suicide attempt, and anti-depressant use. ECF No. 32 at 21-22 ¶¶ 106-108. Additionally, alcohol is a depressant, that not only cannot be taken safely with anti-depressants but also negatively enhances suicidal ideations. Especially in someone who has attempted suicide previously. Notwithstanding the aforementioned, alcohol is known to lower the inhibitions of the imbiber. Therefore, consuming alcohol can encourage recidivism as the lowered inhibitions can tend to lead to bad decision-making and returning to well-established vices. These two factors combined make this special condition an especially appropriate condition for the defendant. For these reasons, the government requests that this special condition be imposed as part of the defendant's term of supervised release. In the event the Court finds that the demonstrated conduct of the defendant is insufficient to impose this special condition, the government requests that the defendant be required to undergo an alcohol abuse assessment and comply with all recommended treatment.

### iii.    Response to objection to special condition No. 8: polygraph testing.

As an initial matter, any Fifth Amendment arguments against the imposition of polygraph testing are contrary to established Ninth Circuit precedent. The Ninth Circuit has consistently rejected Fifth Amendment challenges to polygraph conditions of the sort at issue here. *See, e.g.*, *Stoterau*, 524 F.3d at 1003-04; *United States v. Ross*, 851 F. App'x 793, 794 (9th Cir. 2021); *United States v. Parsons*, No. 22-30101, 2024 WL 1574349, at *2 (9th Cir. Apr. 11, 2024). As the Ninth Circuit acknowledged in *Ross*, "[t]he absence of language

13

ensuring compliance with the Fifth Amendment does not render the [polygraph] condition unconstitutional or otherwise infirm." 851 F. App'x at 794. Given established Ninth Circuit precedent, the defendant has no basis to argue that the polygraph condition violates his Fifth Amendment rights here.

*United States v. Bahr* does not change the analysis. 730 F.3d 963 (9th Cir. 2013). In *Bahr*, the Ninth Circuit found that requiring compliance with a treatment program implicated the Fifth Amendment because the treatment program mandated "full disclosure of past sexual misconduct." *Id.* at 966-67. Accordingly, the defendant faced revocation for failure to complete treatment. *Id.* By contrast, the polygraph condition at issue here merely requires the defendant to submit to polygraph examinations; it does not require him to 'answer questions truthfully' regardless of whether they are self-incriminating, as the defendant states in objecting to this condition. *See* Def. Sent. Memo at 5:11-12. Thus, any Fifth Amendment challenge to this condition should be rejected by the Court.

For these same reasons, the defendant's claim that "faulty polygraph results" could result in a violation of this condition is also without merit. *See* Def. Sent. Memo at 4:23 Under the plain language of the condition, the defendant must merely "submit to periodic polygraph testing at the discretion of the probation officer." ECF No. 31 at 30 ¶ 8 The defendant does not violate this condition, and is not in danger of revocation, merely by providing an answer that results in a significant reaction. Indeed, the defendant has cited no instance in which a court has found an individual to be non-compliant with a polygraph condition merely with results suggesting untruthfulness.

Equally meritless is any claim that polygraph examinations are insufficiently reliable to be utilized as a condition of release. First, the defendant conflates the use of polygraph examinations as evidence of guilt with their use as a tool of supervision. For example, the

objection posits that a supervisee violates the terms of supervision by "arbitrarily 'failing' a test." Def Sent. Memo at 5:3-9. That is not the case. Quite the contrary, the USPO utilizes polygraph examinations as a treatment tool in conjunction with other conditions and methods of supervision. To illustrate, a significant reaction on a polygraph examination may lead to disclosures during the polygraph, questioning from the supervising officer, or focus on certain topics during individual therapy. And, in some instances, if the results raise significant concerns regarding public safety (e.g., significant reaction as to sexual contact with a minor), it could result in the search of the supervisee and/or his property. By the plain language of the condition, however, a supervisee does *not* violate the terms of his supervision merely because of a significant reaction on a polygraph. Rather, only his failure to participate or information learned as a result of the polygraph (e.g., possession of child pornography) can result in revocation.

Second, it is well-established that the polygraph examinations utilized by the USPO are sufficiently reliable to serve as a treatment tool. Even the lowest estimates of reliability establish that polygraph testing is at least 50% accurate. *See, e.g.*, *United States v. Scheffer*, 523 U.S. 303, 310 (1998). The screening tests utilized for sex offenders are best estimated to be at least 80% accurate. Regardless, polygraph examinations have become an accepted tool to assist in supervising sex offenders. *See, e.g.*, Gannon, T., Wood, J., Pina, A., Tyler, N., Barnoux, M. & Vazquez, E., AN EVALUATION OF MANDATORY POLYGRAPH TESTING FOR SEXUAL OFFENDERS IN THE UNITED KINGDOM, Sex Abuse 178-203 (2014). Indeed, "[e]very circuit to consider the issue has upheld the imposition of polygraph testing as a condition of supervised release, at least where the circumstances call for it." *United States v. Brewster*, 627 F. App'x 567, 570-71 (7th Cir. 2015) (gathering cases,

including *United States v. Weber*, 451 F.3d 552 (9th Cir. 2006)); *see also Stoterau*, 524 F.3d at 1006-7. For these reasons, the Court should impose this polygraph condition.

### iv. Response to objection to special condition No. 9: computer monitoring.

The defendant's objection fails for three main reasons each stemming from a misunderstanding or misapplication of the caselaw cited in the defendant's sentencing memo. Firstly, it incorrectly relies on the holding in *Sales* [12], a matter involving the counterfeiting of US federal reserve notes, a crime that requires no use of the internet to commit. The Court in *Quinzon*, a matter involving a defendant who was convicted of the possession of child pornography, specifically rejected the finding in *Sales* as inapplicable to a matter involving the use of the internet and CSAM. Accordingly, *Sales* is wholly distinguishable from the instant matter and reliance on its holding is improper and misrepresents the specific circumstances in this case. The instant matter involves the trafficking of the CSAM through the use of the internet and digital devices capable of connecting to the internet. As stated in *Quinzon*, even if the computer monitoring condition enumerated in *Quinzon* "might have been inappropriate in the case of the counterfeiter in *Sales*, is not overbroad applied to [*Quinzon*]. It is not obviously more intrusive than conditions we have found permissible in other child pornography cases." *Quinzon* citing *Goddard*, 537 F.3d at 1089–90 n. 2, 1090 n. 3 (approving, in the case of a defendant convicted of a child pornography offense, conditions (1) permitting "use only [of] those computers and computer-related devices ... as approved by the Probation Officer," and (2)

---

[12] The defendant in his sentencing memo incorrectly cites the 9th circuit case *Hulen* for the proposition that the 9th circuit has held compliance with the fourth amendment requires narrow tailoring of the computer monitoring search parameters, however, based upon the government's review it appears this is in error. The quote cited by the defendant is from the 9th circuit case *Sales*. *See* Def Sent. Memo at 7:10-14

subjecting "[a]ll computers, computer-related devices, and their peripheral equipment ... to search and seizure ... including unannounced seizure for the purpose of search"); and *Rearden*, 349 F.3d at 621 (approving similar conditions).

Secondly, the defendant improperly relies on the facts of *Quinzon* to determine the parameters of the term "narrowly tailored" as applicable in the instant matter. Additionally, the defendant misstates the crux of its holding to be interpreted as more restrictive than enumerated by the Court in *Quinzon*.

The Court of Appeals in *Quinzon* affirmed the district court sentence of imposing the "installation of monitoring software and hardware…in an amount not to exceed $30 per month per device connected to the internet." It went on further to hold that this sentence was not overboard as the "district court, moreover, was not required to, nor could it now, specify precisely what monitoring hardware or software, or other type of computer surveillance technology, should be used" since the defendant in that matter was not "scheduled to be released for approximately five years, and the monitoring condition is to be in place for an additional thirty." *See United States v. Quinzon,* 643 F.3d 1266 (9th Cir. 2011) at 1274. Additionally, the Court in *Quinzon* addressed the impracticality of the district court to determine how monitoring could be accomplished, especially in light of constant and rapidly changing technology, and the necessity of the Probation Office to "ensure not only the efficacy of the computer surveillance methods used, but also that they remain reasonably tailored so as not to be unnecessarily intrusive."

Lastly, the defendant fails to provide context regarding the 9th circuit *Weaver* matter refenced in his memo and only provides a brief and vague overview of the discussion with probation. Defendant Reginald Weaver was originally convicted of offenses related to the trafficking of a minor and CSAM. He was placed on supervised release and ultimately had

17

two matters pending in federal court. The first was a Sex Offender Registration and Notification Act (SORNA) violation pending in front of Judge Boulware, and the second was a supervised release revocation hearing pending in front of Judge Gordon. In the SORNA matter, after the defendant pleaded guilty to the charge and ahead of sentencing, Judge Boulware ordered the parties to confer with probation about the computer monitoring condition. During this conversation, probation explained to the parties that the computer monitoring software utilized in the district is the same software utilized across the nation after extensive vetting to ensure uniformity and compliance with the current conditions. Probation noted that the software allows the assigned probation officer to efficiently monitor the device and supervisee's activity, and without it the officer would effectively spend all their time monitoring the device to ensure compliance with conditions. They further explained that the software has two key elements to assist the assigned probation officer tasked with monitoring the activities of a supervisee's digital device, which without they would have to complete manually, around the clock.

First, the software takes frequent and periodical snapshots of the digital device to document what it looks like in that very moment. These snapshots are provided to the probation officer and can be reviewed at a later time or immediately. Practically speaking these snapshots are not reviewed in real-time as it would be impossible to do so on every matter, regularly, around the clock as a matter of practice. The software, however, also takes an additional snapshot when a specific keyword or search term that is prohibited is used within the device. These snapshots and notifications are also provided to the assigned probation officer. The specific prohibited keywords and terms can be tailored to a defendant's unique circumstances and offenses. This software is crucial for probation to effectively monitor the supervisee as it allows them access to the state of the phone at any

given moment so that the contents cannot be concealed, and notifies them of searches of prohibited terms.

As stated in *Quinzon*, probation is a crucial "arm of the Court" and the office tasked with ensuring compliance with supervision conditions. As such, we should rely on their expertise in the area related to how to efficiently and effectively monitor supervisees digital devices. Further, because of the demonstrated lengths the defendant has shown he will go to satisfy his proclivities, just as in *Quinzon*, the use of the aforementioned software to monitor the defendant's digital devices "involves no greater deprivation of liberty than is reasonably necessary." *Quinzon,* 643 F.3d 1266 at 1273

The investigation in this case revealed, and the defendant admitted, that he utilized an online messaging application to chat with numerous minors on the internet and several other applications to complete the scheme outlined above to produce and receive CSAM for a fee. In addition to the use of Telegram, the defendant furthered his victimization of minors on the internet through the use of Amazon, CashApp, and other aspects of the internet to download and save images of CSAM and adult pornography, as well as different parts of the digital device he used to take, send, and store photos sent or received by the defendant. His use of digital devices and the internet was not specific or limited in any manner to only a portion of the internet or digital device. In fact, even after the defendant made attempts to conceal his behavior from being discovered by his family or law enforcement by deleting the images from his Telegram chat with Victim #1, the totality of his conduct was revealed by searching the entire digital device. Similarly, to truly ensure that the defendant is in compliance with his computer conditions, prevent recidivism, and further victimization of minors, probation, as mandated to do so, needs to be able to search the totality of the device that is being monitored and the activities taking place on it. Additionally, as previously

discussed, the use of this software is crucial as it is not feasible for the assigned probation officer to manually monitor a digital device around the clock. Limiting the use of the software will also provide the defendant with additional opportunities to conceal activities and avoid detection of relapse.

The condition is not overboard, it is necessarily broad to ensure actual compliance. Any limit of the computer monitoring condition would effectively provide the defendant with the ability to conceal activities and avoid detection or rehabilitation. As such the government requests that the Court impose this special condition as recommended by probation

> **v.    Response to objection to special condition No. 10: computer search – monitoring software.**

As a practical matter, although the defendant objects to the imposition of this condition as a whole, the condition is necessary for Probation to implement Special Condition No. 9 (Computer Monitoring). Indeed, the express purpose of the condition is "[t]o ensure compliance with the computer monitoring condition." ECF No. 31 at 30 ¶ 10 The search itself is also limited to these purposes, including "determining whether the computer contains any prohibited data prior to installation of the monitoring software; to determine whether the monitoring software is functioning effectively after its installation; and to determine whether there have been attempts to circumvent the monitoring software after its installation." *Id*. These limitations allow Probation to implement the computer monitoring software, and ensure compliance, without exercising a greater deprivation of the defendant's liberty than necessary.

For the same reason, any objection based on the lack of a suspicion requirement is baseless. The condition is already limited to specific purposes for the search, and the

imposition of a reasonable suspicion requirement would thwart the purpose of the condition (and could effectively exempt the defendant from computer monitoring). By contrast, the defendant has little to no privacy interests in devices subject to computer monitoring as the Ninth Circuit has upheld general suspicionless search conditions of supervisees convicted of offenses related to child pornography. *See United States v. Tafelmeyer*, 584 F. App'x 766, 767 (9th Cir. 2014) (unpublished). The general search condition here includes a reasonable suspicion limitation, and this is more than sufficient to protect any privacy interests the defendant may have in his electronic devices as a supervisee.

**D. Restitution**

In his plea agreement, the defendant agreed to pay restitution in the amount of $5,000 per victim for any victim who may be identified through the Child Victim Identification Program (CVIP) or Child Recognition Identification System (CRIS), and requests restitution prior to sentencing, so long as the government is able to meet its burden under 18 U.S.C. § 2259 and pursuant to *Paroline v. United States*, 134 S. Ct. 1710 (2014).

Though restitution is mandatory in the instant matter pursuant to 18 U.S.C. § 2259, due to the nature of the production and receipt scheme engaged in by the defendant to traffic in CSAM, the government is unable to meet its burden at this time to request restitution for otherwise eligible victims. Firstly, 18 U.S.C. § 2259(2)(a) requires that the Court determine the "full amount of the victim's losses that were incurred or are reasonably projected to be incurred by the victim as a result of the trafficking in child pornography depicting the victim."

The CSAM newly produced at the direction of the defendant, created not only abuse material that would otherwise not exist, but also cultivated a crop of victims not known to law enforcement until recently. Because of the recency of the identification of victims, and the creation of the CSAM the government is unable at this time to show losses incurred or reasonably projected losses that the victim may incur.

The minors victimized by the defendant were previously unknown to law enforcement and the National Center for Missing and Exploited Children (NCMEC). As such, their CSAM, and identification were only recently included in the NCMEC database, after extensive and diligent efforts by law enforcement. Though each identified minor has been contacted to be informed of their victims' rights, they, and their guardians, are too early in the process to fully conceptualize or comprehend the harm, the complicated legal procedures, and potential need for representation. For these reasons, the government is unable to demonstrate the necessary loss amount to complete the restitution analysis under 18 U.S.C. § 2259(2).

As such, at this time, the government is not seeking restitution.

//
//
//
//
//
//

## V.    CONCLUSION

Based on the above, this Court should sentence the defendant to a term of incarceration of 180 months, followed by a lifetime term of supervised release including all conditions recommended by Probation.

Respectfully submitted this 6th day of March 2025

SUE FAHAMI
Acting United States Attorney


_/s/ Afroza Yeasmin_
AFROZA YEASMIN
Assistant United States Attorney